JOSEPH J. RAMONDETTA II ET AL. *v.* SALVATORE AMENTA, TRUSTEE
(AC 26160)

DiPentima, Rogers and Freedman, Js.

Argued April 24—officially released August 15, 2006

*Kent D. Mawhinney,* for the appellants (plaintiffs).

*Kari L. Olson,* with whom, on the brief, was *Everett E. Newton,* for the appellee (defendant).

*Opinion*

ROGERS, J. This appeal arises from the settlement of a trust. The plaintiffs, Joseph J. Ramondetta II and John Ramondetta, appeal from the judgment of the trial court rendered in favor of the defendant, Salvatore Amenta, trustee, contending that the court improperly (1) concluded that the defendant did not breach his fiduciary duty as trustee and (2) rejected their statute

of limitations defense. In addition, they raise multiple claims concerning the court's award of damages. We affirm the judgment of the trial court.

The court's memorandum of decision and the record reveal the following facts.[1] In the spring of 1971, Salvatore Amenta, Sebastian Ramondetta, Joseph Ramondetta, Jack Cannarella, Nicholas Cecere and Sarino Garafolo formed a partnership called Allied Investors. Each partner contributed $25,000 toward the purchase of 132 Silas Deane Highway in Wethersfield (property). On May 4, 1971, the partners entered into a trust agreement (trust agreement), through which the property was held and managed. The trust agreement appointed the defendant as trustee.

Although no provision was made in the trust agreement for trustee fees, the defendant had an oral agreement with his partners that he would be compensated for his work as trustee when the property eventually sold. As the court recounted: "The original settlors of the trust were close personal friends who did business on an informal basis. Ongoing expenses like mortgage payments and payment of taxes were frequently made after an in person or telephone request. That [the defendant] did not present a bill for services until the trust was settled is of no moment. For a number of years, there was no income to the trust because the trust building was unoccupied. There was no money in the trust from which [the defendant] could be paid. The same situation affected the trust's lawyers . . . who

---

[1] The plaintiffs' brief states that "all of the issues raised by the plaintiffs on appeal . . . are issues of law." To the extent that the plaintiffs suggested at oral argument that certain factual findings are erroneous, we refuse to entertain such claims. "Parties may not raise issues for the first time during oral argument." *Robert M. Elliott, P.C.* v. *Stuart*, 53 Conn. App. 333, 346 n.3, 730 A.2d 1176, cert. denied, 249 Conn. 928, 733 A.2d 848 (1999). "[A]n appellant's claims must be fully and adequately briefed and argued in the brief submitted to this court." *Legnos* v. *Legnos*, 70 Conn. App. 349, 350 n.1, 797 A.2d 1184, cert. denied, 261 Conn. 911, 806 A.2d 48 (2002).

were also not paid for years worth of work until the building was sold. [The defendant's] uncontradicted testimony was that because of the cash shortage, he and the original settlors of the trust agreed that he would be paid when the trust building was sold and money became available."

For almost twenty years, the defendant managed, without compensation, the property, a 16,000 square foot commercial building. At trial, the defendant presented uncontradicted evidence that he worked 420.5 hours on trust business over those years. The court found that during that time, the defendant "had first to supervise refitting the building to get their first tenant, the Connecticut Lotto, into the building. [He] subsequently leased the building to an environmental consulting firm, TRC, and a contractor supply company. In the 1990s, the Hartford area's economy slowed. Nevertheless, [the defendant] pursued opportunities to rent the property on an ad hoc basis. When the property was vacant, [he] continually searched for both potential tenants and buyers. He was responsible for fixing and dealing with the problems arising in an older building, i.e., roof repairs, furnace repair, boarding of broken windows and ground maintenance. He had to deal with the health department over recurring litter problems. [He] was responsible for depositing payments from the trust members, overseeing the trust's accounts, paying the trust bills when they came due and making sure that the trust had enough money to do so."

In addition, Robert Amenta, the defendant's son, provided accounting services to the trust. The court explained: "Robert Amenta acted as the trust's accountant for sixteen years. In that capacity, he kept all the trust's books and accounts, and each year prepared both the state and federal tax returns for the trust's partnership. The plaintiffs were aware that Robert Amenta was the trust's accountant. The plaintiffs had

their accountants meet with Robert Amenta on more than one occasion to review the plaintiffs' contributions to the trust for tax purposes. The plaintiffs never objected to Robert Amenta's acting as accountant to the trust or complained about the quality of his work." Like the defendant, Robert Amenta was not paid for his services during his sixteen years of work, instead awaiting compensation when the property sold. That arrangement was agreed to by the other partners.

Several events transpired in 1992 regarding the trust agreement. Three of the partners sold and conveyed to the other partners their respective interests in the trust. As a result, the defendant owned half of the trust, and Sebastian Ramondetta and Joseph Ramondetta owned the other half. The trust agreement subsequently was amended to reflect that change. The amendment further provided that "[a]ll the remaining provisions contained in the trust agreement shall remain in full force and effect." While amending the trust agreement, the remaining partners reiterated the express agreement that the defendant would be compensated for his services as trustee when the property ultimately sold.

In 1998, Joseph Ramondetta and Sebastian Ramondetta conveyed their interests in the trust to the plaintiffs.[2] As a result, the plaintiffs acquired a one-half interest in the trust. The trust agreement once again was amended to reflect the ownership change. Like the prior amendment, the 1998 amendment stated that "[a]ll remaining provisions contained in the trust agreement, as amended, shall remain in effect." In addition, the amendment provided that "[i]mmediately following execution of this herein second amendment, [the defendant] shall convey the property to a partnership, Allied

[2] Joseph Ramondetta is the father of the plaintiffs; Sebastian Ramondetta is their uncle. The record is silent as to whether the plaintiffs provided any consideration for their interests in the trust.

Investors II, which partnership shall be owned in the same manner as the trust herein, to wit: [the defendant] shall own 50 [percent]; Joseph Ramondetta II shall own 25 [percent] and John Ramondetta shall own 25 [percent]." On June 30, 1998, the property was quitclaimed to Allied Investors II.

The property was sold to a third party on January 5, 2001. As the court stated: "The initial investment by the six original settlors was $25,000 apiece or a total of $150,000. The property sold . . . for a gross of $709,000. . . . [T]he plaintiffs acknowledged that the value received for the property was very good." Following the sale, the defendant immediately issued the plaintiffs a check in the amount of $250,000, which they cashed. The defendant also paid various bills on behalf of the trust, including bills from attorneys, environmental companies, real estate agents and other professionals. At that time, the defendant requested payment for his services as trustee and for Robert Amenta's services as accountant. The plaintiffs refused. Hoping to avoid "any hassle" and "to keep peace," the defendant decided to pay himself a trustee fee of $10,000 and pay Amenta an accounting fee of $10,000. The defendant testified that the trustee fee was "nowhere near the work [he] did."

The plaintiffs thereafter filed suit against the defendant by way of a complaint alleging breach of fiduciary duty and breach of the duty of good faith and fair dealing.[3] The complaint raised no allegation as to the quality of the services performed by the defendant as trustee. Rather, it concerned only the defendant's payment of trustee and accounting fees following the sale of the property.

[3] The complaint also alleged a violation of the Connecticut Unfair Trade Practices Act. See General Statutes § 42-110a et seq. That count was withdrawn.

The defendant filed an answer and counterclaim in response. The counterclaim alleged that "the plaintiffs have been unjustly enriched at the expense of the [defendant]." To that counterclaim, the plaintiffs filed an answer and special defense. They pleaded the special defense as follows: "The [d]efendant's claims are barred by the applicable [s]tatute of [l]imitations."

A trial before the court followed. By memorandum of decision, the court found in favor of the defendant on the plaintiffs' complaint, concluding that the defendant breached neither his fiduciary duty nor the duty of good faith and fair dealing. The court further found that the plaintiffs had been unjustly enriched and, accordingly, ruled in favor of the defendant on his counterclaim, awarding him $20,000 in damages. The plaintiffs filed motions to reargue and to articulate, which the court denied. This appeal followed.

## I

## BREACH OF FIDUCIARY DUTY

The plaintiffs first challenge the court's conclusion that the defendant did not breach his fiduciary duty as trustee.[4] We disagree.

In their appellate brief, the plaintiffs contend that a trust immediately terminates when the trust property ceases to exist. Whether that proposition is correct is largely an academic question; 1A A. Scott, Trusts (4th Ed. Fratcher 1987) § 74.2, p. 434; and one on which authorities are split.[5] The authorities are in agreement,

---

[4] "The trustee is accountable to the beneficiary for breaches of fiduciary duties." C. Rounds, A Trustee's Handbook (2002 Ed.) § 7.2, p. 312.

[5] See 2 Restatement (Second), Trusts § 342, p. 181 (1959) ("[i]f there is a sole beneficiary who is not under an incapacity and the trustee transfers the trust property to him or at his direction, or if there are several beneficiaries none of whom is under an incapacity and the trustee transfers the trust property to them or at their direction, the trust terminates although the purposes of the trust have not been fully accomplished"); 1 Restatement (Third), Trusts § 2, comment (i), p. 23 (2003) ("[i]f a trust is created and subsequently the whole of the trust property ceases to exist, the trust is

however, that the fiduciary duty of a trustee does not immediately terminate when the trust property ceases to exist.[6] Rather, the trustee's fiduciary duty survives even the termination of the trust. See 4 A. Scott, Trusts (4th Ed. Fratcher 1989) § 344, p. 542 ("[w]hen the time for the termination of the trust has arrived, the duties and powers of the trustee do not immediately cease; until the trust is actually wound up, he has such duties and powers as are appropriate for the winding up of the trust"); 1A A. Scott, Trusts (4th Ed. Fratcher 1989) § 74.2, p. 435 (trustee still under duty to account to beneficiary and still owes fiduciary duties as "fiduciary relation continues, although it ceases to be a relation

---

terminated because the trustee no longer holds anything in the trust"); *Harris* v. *Harris*, 287 N.Y. 444, 448, 40 N.E.2d 245 (1942) (trust terminated on conveyance of trust property to third party); but see 1A A. Scott, supra, § 74.2, p. 435 (although trust cannot be created without requisite corpus, "trust is not altogether extinguished merely because the trustee no longer holds any property in trust"); Uniform Trust Code § 410, comment (withdrawal of trust property not event terminating trust).

[6] The plaintiffs maintain that the termination of a trust immediately terminates the fiduciary duty of the trustee. The only authority provided by the plaintiffs for that assertion is *National City Bank of Michigan/Illinois, Trustee* v. *Northern Illinois University*, 353 Ill. App. 3d 282, 818 N.E.2d 453 (2004), in which the Appellate Court of Illinois, citing 2 Restatement (Second), Trusts § 342 (1959), stated that "[w]hen a trustee conveys all the property that he or she holds, the trustee ceases to owe any fiduciary obligation *to such property* and such a conveyance terminates the trust." (Emphasis added.) *National City Bank of Michigan/Illinois, Trustee* v. *Northern Illinois University*, supra, 289. Although the fiduciary obligation to the property ceases upon termination, a trustee's fiduciary obligation to the beneficiaries continues. As the Restatement (Second) of Trusts indicates, "[a]lthough the time for the termination of the trust has arrived . . . the trustee does not thereby necessarily cease to be trustee, but he continues to be trustee until the trust is finally wound up." 2 Restatement (Second), supra, § 344, comment (a), p. 191. The "duties of the trustee in the winding up of the trust are similar to [those] in administering the trust . . . ." (Citation omitted.) Id. Furthermore, were the plaintiffs correct in their contention that the 1998 conveyance of the trust property to Allied Investors II terminated the defendant's fiduciary obligation, they could not prevail under a claim alleging breach of fiduciary duty, as it was only after the property both was quitclaimed to Allied Investors II and later sold to a third party that the defendant paid the trustee and accounting fees.

with respect to any specific property"); 2 Restatement (Second), Trusts § 344, p. 190 (1959) ("[w]hen the time for the termination of the trust has arrived, the trustee has such powers and duties as are appropriate for the winding up of the trust").

A trustee is permitted a reasonable time to wind up trust affairs. "At such time when the trust is terminated in any way . . . the trust nevertheless continues for a reasonable time during which the trustee has power to perform such acts as are necessary to the winding up of the trust and the distribution of the trust property . . . . Determination of what constitutes a reasonable period within which to wind up the trust and distribute the trust assets will depend upon a number of facts with respect to the particular trust." G. Bogert & G. Bogert, Trusts and Trustees (2d Ed. Rev. 1983) § 1010, pp. 448–51; see also *Trust Created Under Will of Damon*, 76 Haw. 120, 126, 869 P.2d 1339 (1994) ("trust will undoubtedly continue for a substantial time after termination during the winding up period"); Uniform Trust Code § 816 (26) (trustee may "on termination of the trust, exercise the powers appropriate to wind up the administration of the trust and distribute the trust property to the persons entitled to it"). What is reasonable in a particular case is a fact specific question. As one authority states: "What constitutes a reasonable time depends on the circumstances. Under some circumstances there may be a considerable period elapsing before it is possible to complete the process of winding up the trust and to make a final distribution of the trust property." 4 A. Scott, Trusts (4th Ed. Fratcher 1989) § 344, p. 545; accord 2 Restatement (Second), supra, § 344, comment (a), p. 191 ("period [for winding up the trust] may properly be longer or shorter, depending upon the circumstances"). We therefore focus our attention on the facts and circumstances of the present case.

In 1998, the trust agreement was amended to reflect that the plaintiffs had acquired a 50 percent interest in the trust. It further provided that "[a]ll remaining provisions contained in the trust agreement, as amended, shall remain in effect." The amendment also directed the defendant to convey the property to the Allied Investors II partnership.[7] The defendant promptly complied with that directive, and the property was quitclaimed to Allied Investors II on June 30, 1998.

Following that conveyance, the defendant continued his work managing and marketing the property, as he had done for years. The plaintiffs never objected to his efforts. The court specifically found that the plaintiffs "knew [that the defendant] had his own business to run and took time away from that business to attend to the affairs of the trust." The plaintiffs thus availed themselves of the benefit of the defendant's services. The defendant's work continued until January 5, 2001, when the property was sold to a third party. Upon the sale of the property in 2001, the defendant began winding up the administration of the trust. He first issued the plaintiffs a check in the amount of $250,000. The defendant then paid various bills on behalf of the trust, including ones due to attorneys, environmental companies, real estate agents and other professionals. Those actions are consistent with paragraph three of the trust agreement, which provides that, upon sale of the property, the trustee shall pay all outstanding expenses. Again, the plaintiffs never objected to the defendant's efforts.

The 1998 amendment to the agreement, while directing the defendant to convey the property to Allied Investors II, expressly provided that "[a]ll remaining

[7] Allied Investors was the name of the original partnership between the settlors of the trust. The 1998 amendment provided that the plaintiffs and the defendant each held a 50 percent interest in Allied Investors II.

provisions contained in the trust agreement, as amended, shall remain in effect." Inclusion of that provision undermines the plaintiffs' contention that the parties intended for the trust to terminate and the defendant's role as trustee to cease upon conveyance of the property. See *Hatcho Corp.* v. *Della Pietra*, 195 Conn. 18, 23, 485 A.2d 1285 (1985) ("[p]arties generally do not insert meaningless provisions in their agreements and therefore every provision must be given effect if reasonably possible"). The fact that, in the years subsequent to the amendment, the defendant's work continued without any objection by the plaintiffs is significant, particularly when considered in light of the aforementioned amendment provision. Four years elapsed between the time the 1998 amendment was signed and the time the property ultimately was sold and the trust expenses fully paid. In light of the foregoing, we conclude that that was a reasonable time to complete the process of winding up the trust.

The court found that the defendant had an oral agreement with the settlors, and later with the plaintiffs, that he would be compensated for his services as trustee when the property eventually sold. Accordingly, the court's determination that the defendant's payment of trustee and accounting fees following the sale of the property did not constitute a breach of fiduciary duty was proper.

## II

## STATUTE OF LIMITATIONS

The plaintiffs next claim that the court improperly rejected their statute of limitations defense to the defendant's unjust enrichment counterclaim. They pleaded the defense as follows: "The [d]efendant's claims are barred by the applicable [s]tatute of [l]imitations." That pleading is inadequate. A similar situation arose in *Avon Meadow Condominium Assn., Inc.* v. *Bank of Boston*

*Connecticut,* 50 Conn. App. 688, 719 A.2d 66, cert. denied, 247 Conn. 946, 723 A.2d 320 (1998), in which the defendant failed to plead specifically a statute of limitations defense. We held: "Practice Book § 10-3 (a) provides that '[w]hen any claim made . . . in a . . . special defense . . . or other pleading is grounded on a statute, the statute shall be *specifically* identified by its number.' . . . . We conclude that the defendant failed to plead the defense of the statute of limitations . . . . By not specifically pleading the statute of limitations in its special defense, the defendant waived its right to have [that defense] considered by the trial court." (Citations omitted; emphasis in original.) *Avon Meadow Condominium Assn., Inc.* v. *Bank of Boston Connecticut,* supra, 698.

At the same time, our courts repeatedly have recognized that the rule embodied in Practice Book § 10-3 is directory and not mandatory. See, e.g., *Steele* v. *Stonington,* 225 Conn. 217, 221 n.7, 622 A.2d 551 (1993); *Fleet National Bank* v. *Lahm,* 86 Conn. App. 403, 405 n.3, 861 A.2d 545 (2004), cert. denied, 273 Conn. 904, 868 A.2d 744 (2005). "As long as the defendant is sufficiently apprised of the nature of the action . . . the failure to comply with the directive of Practice Book § 10-3 (a) will not bar recovery." (Citation omitted.) *Spears* v. *Garcia,* 66 Conn. App. 669, 676, 785 A.2d 1181 (2001), aff'd, 263 Conn. 22, 818 A.2d 37 (2003). In *Spears,* the plaintiffs failed to plead the protections of General Statutes § 52-557n in their complaint. *Spears* v. *Garcia,* supra, 676. Because the plaintiffs relied on that statute in their memorandum of law in opposition to the defendants' motion for summary judgment and in oral argument before the trial court, we concluded that the defendants were sufficiently apprised of the nature of the action. Id. Similarly, in *Altfeter* v. *Naugatuck,* 53 Conn. App. 791, 802, 732 A.2d 207 (1999), an individual

defendant failed to plead the applicable statute of limitations as a special defense when he answered the amended complaint and did not identify the applicable statute in his motion for summary judgment. Nevertheless, that defendant specifically cited General Statutes § 52-576 (a) as the legal basis for his motion for summary judgment in his memorandum of law in support of the motion. *Altfeter* v. *Naugatuck*, supra, 802. Although we noted that the "better method" is to identify in the pleading the applicable statute of limitations as required by Practice Book § 10-3 (a); *Altfeter* v. *Naugatuck*, supra, 802 n.9; the defendant's failure to do so was harmless in light of the subsequent discussion of § 52-576 (a) in his memorandum of law. Id., 802.

The present case is distinguishable from *Spears* and *Altfeter*. At no time did the plaintiffs identify the specific statute of limitations that allegedly barred the defendant's counterclaim. It is unclear whether the plaintiffs themselves understood precisely which statute of limitations applied, as evidenced by the lack of analysis of the statute of limitations issue in their posttrial memorandum of law. That analysis consisted of the following sentence: "Clearly, the statute of limitations for an oral agreement is three (3) years, with a limitation for a written agreement being six (6) years." No further discussion of law or facts followed. As the court noted in its memorandum of decision, the statute of limitations defense "stands as a bare statement in the brief with no statutory citation and no case authority so holding under the facts of this case."

At no point from the filing of the defendant's counterclaim to the rendering of judgment by the court did the plaintiffs identify the applicable statute on which they relied. That infirmity is fatal to the plaintiffs' claim. The underlying purpose of affirmative pleading is to apprise the court and the opposing party of the issue to be tried. See *Faulkner* v. *United Technologies Corp.*, 240

Conn. 576, 589, 693 A.2d 293 (1997). Consistent with that purpose, a party raising a statute of limitations defense must identify the statute that allegedly is applicable. In pleading such a defense, the bare assertion that "the applicable statute of limitations" bars a particular action is inadequate to apprise the court or the opposing party sufficiently of the nature of the defense. Because the plaintiffs failed at any time to identify the applicable statute on which they relied, the court properly treated their defense as waived.

### III

### CHALLENGES TO THE COURT'S AWARD

The plaintiffs next assail the court's determination on the defendant's counterclaim that they were unjustly enriched. The plaintiffs do not quarrel with the court's factual finding that they received a benefit from the defendant's services for which they did not compensate him. Rather, they raise multiple claims concerning the court's award of damages. We review that award under the clearly erroneous standard. *United Coastal Industries, Inc.* v. *Clearheart Construction Co.*, 71 Conn. App. 506, 514, 802 A.2d 901 (2002). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *United Technologies Corp.* v. *East Windsor*, 262 Conn. 11, 23, 807 A.2d 955 (2002).

The court awarded the defendant $20,000 in damages on his unjust enrichment counterclaim. The question is whether there is evidence in the record supporting that determination.

In its memorandum of decision, the court found that the "[p]laintiffs knew [the defendant] had his own business to run and took time away from that business to

attend to the affairs of the trust." The court found that the defendant worked 420.5 hours over twenty years on trust business. Relying on *Bissell* v. *Butterworth*, 97 Conn. 605, 118 A. 50 (1922), the court stated further that "[a] trustee is entitled to a reasonable fee absent an express provision in the trust agreement to the contrary."[8] At trial, the defendant estimated the reasonable value of his time to be "at least $100 an hour."[9] That figure was not contested at any time by the plaintiffs.[10] Applying that figure to the finding that the defendant worked 420.5 hours on trust business yields a total fee of $42,050.

We are also mindful that the measure of damages in an unjust enrichment case ordinarily is not the loss to the plaintiff but the benefit to the defendant. *Hartford Whalers Hockey Club* v. *Uniroyal Goodrich Tire Co.*, 231 Conn. 276, 285, 649 A.2d 518 (1994). The court had before it evidence that the property sold for a substantial profit. As the court stated: "The initial investment by the six original settlors was $25,000 apiece or a total of $150,000. The property sold . . . for a gross of $709,000." It also found that "the plaintiffs acknowledged that the value received for the property was very good." In addition, the court also heard testimony about

[8] In *Bissell* v. *Butterworth*, supra, 97 Conn. 615–16, our Supreme Court stated: "[I]t is a general principle of law, long prevailing in this and nearly all of the United States, that a trustee is entitled to be reimbursed for all costs which he properly incurs in the execution of a trust, and to fair compensation for his time and trouble in managing the trust fund and performing the duties of an office he has undertaken for the benefit of others; and it is immaterial that no express provision for such charges and expenses has been made by the creator of the trust."

[9] "A party's own testimony about the value of his labor described with reasonable particularity may be the proper measure of unjust enrichment." (Internal quotation marks omitted.) *Gardner* v. *Pilato*, 68 Conn. App. 448, 455, 791 A.2d 707, cert. denied, 260 Conn. 908, 795 A.2d 544 (2002).

[10] Indeed, the plaintiffs stated in their posttrial memorandum that the defendant "testified, and his interrogatory responses confirm, that he believes the value of his services . . . [was] $42,000."

the sale of a small portion of the property to the state of Connecticut. The defendant testified: "[The state] approached me and said, you know, we want to take a portion of this [property]. . . . They made an offer, and I didn't think it was adequate . . . . [S]o, I negotiated more money. . . . Without any attorney or anything, I did it. Originally, I think it was an offer of $40,000, $44,000. I got $81,750, and I did that with direct negotiations, a few trips to the department of whatever it was . . . . I knew no one, there were no connections attached. I just worked hard and got it. . . . [W]e applied that [$81,750] to the mortgage."

Unjust enrichment is a quintessentially equitable cause of action. It is based on the precept that "in a given situation it is contrary to equity and good conscience for the defendant to retain a benefit which has come to him at the expense of the plaintiff." *Schleicher* v. *Schleicher*, 120 Conn. 528, 534, 182 A. 162 (1935). Our Supreme Court has described unjust enrichment as a very broad and flexible equitable doctrine. *Gagne* v. *Vaccaro*, 255 Conn. 390, 409, 766 A.2d 416 (2001), on appeal after remand, 80 Conn. App. 436, 835 A.2d 491 (2003), cert. denied, 268 Conn. 920, 846 A.2d 881 (2004). "With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed to examine the circumstances and the conduct of the parties and apply this standard." *Cecio Bros., Inc.* v. *Greenwich*, 156 Conn. 561, 564–65, 244 A.2d 404 (1968). We conclude that the court properly applied that standard in the present case. Because the award of damages on the defendant's counterclaim finds ample support in the record, we cannot say that it is clearly erroneous.

The plaintiffs' additional claims concerning the award of damages merit little discussion. They allege that

because the defendant "lacks standing to maintain his counterclaim on behalf of the trust's accountant," the court improperly awarded the defendant $10,000 on the counterclaim for accounting services. The defendant's counterclaim, however, was predicated solely on his work as trustee and makes no reference to accounting services.[11] Equally untenable is the contention that the court awarded damages on the counterclaim for accounting services. Nowhere in its memorandum of decision did the court state that it was awarding damages on the unjust enrichment counterclaim for anything other than the defendant's work as trustee.

The plaintiffs also refer to a factual discrepancy concerning the respective contributions to the trust, as the court found that the plaintiffs' "father and uncle contributed a total of $131,844.95" to the trust, while the defendant "contributed $121,369.54." The plaintiffs therefore posit that the court "fail[ed] to take into account [the defendant's] failure to contribute equally to the trust." They also allege that the court failed to calculate the award of damages in light of the terms of either the trust agreement or the partnership agreement. The court's memorandum of decision is silent as to those allegations. Although the plaintiffs filed a motion for articulation, which the court denied, they failed to file a motion for review with this court in accordance with Practice Book §§ 66-5 and 66-7.[12] It

[11] The counterclaim alleged in relevant part: "Since 1970, [the defendant] has acted as [t]rustee to the [t]rust thereby providing significant benefit to all parties to the [t]rust and, upon information and belief, the plaintiffs. . . . As a result of [the defendant's] efforts on behalf of the [t]rust over a period of [thirty] years, the plaintiffs have been enriched. . . . To the extent [that the defendant] has not been paid a reasonable fee for his services as [t]rustee, the plaintiffs have been unjustly enriched at the expense of the [t]rustee."

[12] Practice Book § 66-5 provides in relevant part: "The sole remedy of any party desiring the court having appellate jurisdiction to review the trial court's decision on the motion filed pursuant to this section or any other correction or addition ordered by the trial court during the pendency of the appeal shall be by motion for review under Section 66-7. . . ."

Practice Book § 66-7 provides in relevant part: "Any party aggrieved by the action of the trial judge as regards . . . articulation under Section 66-

is axiomatic that the appellant must provide this court with an adequate record for review. See Practice Book § 61-10; *Narumanchi* v. *DeStefano*, 89 Conn. App. 807, 815, 875 A.2d 71 (2005). "[W]here a party is dissatisfied with the trial court's response to a motion for articulation, he may, and indeed under appropriate circumstances he must, seek immediate appeal of the rectification memorandum to this court via the motion for review." (Internal quotation marks omitted.) *Highgate Condominium Assn.* v. *Watertown Fire District*, 210 Conn. 6, 21, 553 A.2d 1126 (1989). We have observed that the filing of a motion for articulation demonstrates the movant party's "recognition that the trial court's memorandum of decision would benefit from clarification with respect to a number of arguments they now make on appeal." *Wellington Systems, Inc.* v. *Redding Group, Inc.*, 49 Conn. App. 152, 180, 714 A.2d 21, cert. denied, 247 Conn. 905, 720 A.2d 516 (1998). The plaintiffs in the present case did nothing to perfect the record. Although they could have sought review by this court pursuant to Practice Book § 66-7, they elected not to do so. That failure precludes further review of the plaintiffs' claims concerning the award of damages.

The judgment is affirmed.

In this opinion the other judges concurred.

5 may, within ten days of the issuance of notice of the order sought to be reviewed, make a written motion for review to the court, to be filed with the appellate clerk, and the court may, upon such a motion, direct any action it deems proper. . . ."