******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JOHN D. FLANNERY *v.* SINGER ASSET FINANCE
COMPANY, LLC, ET AL.
(SC 18821)

Rogers, C. J., and Norcott, Palmer, Zarella, Eveleigh, Espinosa and
Lavine, Js.*

*Argued January 11, 2013—officially released June 24, 2014*

*Thomas P. Willcutts*, for the appellant (plaintiff).

*Eliot B. Gersten*, with whom was *Richard C. Robinson*, for the appellee (named defendant).

*Opinion*

ROGERS, C. J. This case concerns the availability of the continuing course of conduct doctrine to toll the statute of limitations on a claim of aiding and abetting a principal accused of breach of a fiduciary duty when the alleged aider and abettor has no special relationship with the injured party and engages in no subsequent wrongful behavior related to the original wrong. The plaintiff, John D. Flanery,[1] appeals, upon our grant of his petition for certification,[2] from the judgment of the Appellate Court affirming the trial court's rendering of summary judgment in favor of the defendant Singer Asset Finance Company, LLC.[3] *Flannery* v. *Singer Asset Finance Co.*, *LLC*, 128 Conn. App. 507, 508–509, 17 A.3d 509 (2011). The plaintiff alleged that the defendant had aided and abetted the plaintiff's former attorneys in breaching their fiduciary duties to the plaintiff, and further, that the defendant's actions in this regard constituted a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. In response to the defendant's invocation of the applicable three year statutes of limitations,[4] the plaintiff argued that, because the aiding and abetting claim alleged against the defendant was derivative of the breach of the fiduciary duty claims he had alleged against the attorneys, the limitations period should be tolled as to the defendant on the basis of a continuing course of conduct by the attorneys, even though the defendant itself owed no fiduciary duty to the plaintiff and did not engage in any further activities that would trigger tolling. After concluding for various reasons that tolling was inapplicable and, therefore, that the plaintiff's action was time barred, the trial court rendered summary judgment in favor of the defendant. The Appellate Court subsequently affirmed that judgment.

On appeal, the plaintiff contends that the Appellate Court improperly determined that: (1) his causes of action against the defendant were time barred because he failed to allege sufficient facts in his pleadings before the trial court to invoke the continuing course of conduct doctrine; and (2) under *Fichera* v. *Mine Hill Corp.*, 207 Conn. 204, 541 A.2d 472 (1988), the continuing course of conduct doctrine does not apply to toll the statute of limitations set forth in CUTPA. The defendant contends otherwise and posits, as an alternative ground for affirming the judgment of the Appellate Court, that the undisputed facts in this case preclude the operation of the continuing course of conduct doctrine as a matter of law. We agree with the plaintiff that he sufficiently invoked the continuing course of conduct before the trial court. We agree with the defendant, however, that equitable tolling pursuant to that doctrine is not available on the undisputed facts of this case and, accordingly, we affirm the judgment of the Appellate Court.[5]

For purposes of the summary judgment proceedings

and the subsequent appeal only, the following relevant facts and procedural history were not disputed by the parties.[6] In 1988, the plaintiff won $3 million in the Iowa state lottery, to be paid in twenty annual installments of $150,000. The defendant then was engaged in the business of, inter alia, purchasing the installment payments of lottery winners by providing those winners with discounted lump sum payments. Prior to March, 1999, the defendant had contacted the plaintiff numerous times in unsuccessful attempts to convince him to sell his installment payments. At some point before March 23, 1999, the defendant formed a business relationship with Attorney Glenn MacGrady for the purpose of having MacGrady provide what was purported to be independent professional advice to lottery winners. The purportedly independent advice, however, was tainted by a conflict of interest. Specifically, MacGrady was acting at the behest of the defendant to induce lottery winners to sell their installment payments to it by falsely advising them that they could gain significant tax advantages.[7] Consistent with this strategy, the defendant arranged for MacGrady to communicate with the plaintiff, deliver the misleading advice and attempt to induce him to sell his installment payments to the defendant.[8]

On March 23, 1999, the plaintiff entered into a retainer agreement with MacGrady's law firm, Pepe & Hazard, LLP (Pepe & Hazard), pursuant to which MacGrady and Pepe & Hazard agreed to represent the plaintiff in connection with the sale of his lottery installment payments. The retainer agreement executed by the plaintiff provided that the agreed upon scope of representation was limited to the sale transaction, and that the parties' attorney-client relationship would terminate upon completion of the services associated with the transaction and final billing for that work.[9] In May, 1999, MacGrady and Pepe & Hazard signed an additional retainer agreement with the defendant, agreeing to provide it legal services in connection with its lottery purchase endeavors.[10] On June 24, 1999, on the advice of MacGrady, the plaintiff executed a sale agreement whereby he agreed to sell his eight remaining installment payments, which would have totaled $1.2 million, to the defendant for a discounted lump sum payment of $868,500.

Following the June, 1999 lottery sale, the defendant had no further contact with the plaintiff. It no longer engaged in the lottery purchase business sometime in 2000 or 2001.[11]

On September 15, 1999, Pepe & Hazard sent the plaintiff a final bill for the services it had rendered, thereby terminating the attorney-client relationship. Thereafter, the plaintiff filed a 1999 tax return listing the full amount of the lump sum payment as the proceeds of a sale of a capital asset, paying only the capital gains tax rate on the amount received. In October, 2002, the Internal

Revenue Service (IRS) notified the plaintiff that it did not agree with his treatment of the lump sum payment, and it concluded that the plaintiff owed a tax deficiency of $163,523.

At that time, the plaintiff contacted MacGrady, who no longer was employed by Pepe & Hazard. MacGrady continued to maintain the correctness of the tax advice, and encouraged the plaintiff to join a group of similarly situated lottery winners who also were challenging the IRS' treatment of their lump sum payments. MacGrady provided assistance to, and received a referral fee from, a Florida attorney who ran the tax appeal group. The plaintiff joined this group, which ultimately was unsuccessful with its appeal.

Throughout the entire time over which the foregoing events occurred, from 1999 through 2002, MacGrady never disclosed to the plaintiff his business relationship with the defendant. Moreover, the defendant did not disclose to the plaintiff its relationship with MacGrady.

On July 22, 2005, the plaintiff brought the present action, claiming, in relevant part, that the defendant's conduct amounted to (1) aiding and abetting in the breach of a fiduciary duty[12] by MacGrady,[13] and (2) a violation of CUTPA.[14] In its answer to the complaint, the defendant set forth two special defenses, namely, statutes of limitations and waiver. The plaintiff denied the special defenses and pleaded, by way of avoidance as to the statutes of limitations defenses, estoppel and fraudulent concealment.[15] After considerable discovery, the defendant filed a motion for summary judgment, which the plaintiff opposed. On June 30, 2009, the trial court granted the defendant's motion for summary judgment on the basis that the action was time barred.

Specifically, the trial court reasoned, the breach of the fiduciary duty alleged consisted of a conflict of interest, namely, MacGrady's dual representation of the plaintiff and the defendant. That dual representation ceased to exist, however, when Pepe & Hazard sent the plaintiff its final bill on September 15, 1999, more than three years prior to the plaintiff filing this action in 2005. According to the trial court, "[o]nce the [dual] representation ended any breach of fiduciary duty ended," and, therefore, the statute of limitations, as to both MacGrady and the defendant, as an aider and abettor, began to run on September 15, 1999. The court reasoned additionally that, although MacGrady, as a fiduciary, had an obligation to disclose the dual representation to the plaintiff, the defendant, as a mere purchaser of the lottery payments, owed no such duty to the plaintiff. On the basis of similar reasoning, the trial court also found the plaintiff's claim of fraudulent concealment unavailing.

The trial court further found that the continuing course of conduct doctrine was inapplicable to toll the

running of the statutes of limitations. According to the court, the plaintiff had failed to plead a continuing course of conduct in reply to the defendant's special defenses, and "[c]ontinuing course of conduct is a principle that is required to be specially pleaded." Finally, the court held, the statute of limitations on the plaintiff's CUTPA claim was not subject to tolling pursuant to this court's decision in *Fichera* v. *Mine Hill Corp.*, supra, 207 Conn. 204.

The plaintiff appealed from the judgment of the trial court to the Appellate Court claiming, inter alia, that the trial court improperly determined that the three year statutes of limitations for his aiding and abetting the breach of a fiduciary duty and CUTPA claims; see footnote 4 of this opinion; were not tolled by the continuing course of conduct doctrine.[16] *Flannery* v. *Singer Asset Finance Co.*, *LLC*, supra, 128 Conn. App. 513. The Appellate Court rejected this claim, relying on its decision in *Beckenstein Enterprises-Prestige Park*, *LLC* v. *Keller*, 115 Conn. App. 680, 974 A.2d 764, cert. denied, 293 Conn. 916, 979 A.2d 488 (2009), and concluding that the trial court had properly determined that the plaintiff had not invoked this doctrine either in his complaint or pleading in avoidance as required by Practice Book § 10-57.[17] *Flannery* v. *Singer Asset Finance Co.*, *LLC*, supra, 514–15. The Appellate Court further agreed with the trial court that, pursuant to *Fichera* v. *Mine Hill Corp.*, supra, 207 Conn. 216–17, the continuing course of conduct doctrine was inapplicable to the plaintiff's CUTPA claim. *Flannery* v. *Singer Asset Finance Co.*, *LLC*, supra, 514. Accordingly, the Appellate Court affirmed the judgment of the trial court, concluding that the trial court properly granted the defendant's motion for summary judgment because "the applicable statutes of limitations had not been tolled by the actions of the defendant." Id., 518. This certified appeal followed. See footnote 2 of this opinion.

On appeal, the plaintiff claims that the Appellate Court improperly: (1) concluded that the allegations contained within his pleadings were insufficient to invoke the continuing course of conduct doctrine; and (2) relied on *Fichera* v. *Mine Hill Corp.*, supra, 207 Conn. 216–17, in concluding that the continuing course of conduct doctrine is inapplicable to the statute of limitations governing CUTPA claims. In response, the defendant contends otherwise and posits, as an alternative ground for affirming the judgment of the Appellate Court, that the undisputed facts of this case preclude the operation of the continuing course of conduct doctrine as a matter of law. We disagree with the Appellate Court that the plaintiff did not adequately invoke the continuing course of conduct doctrine but agree, nevertheless, with the defendant that that doctrine is inapplicable on the undisputed facts of this case. Because the plaintiff's tolling claim is entirely nonviable, we need not address his second claim regarding the applicability

of tolling to save an untimely CUTPA action.

## I

We begin with the plaintiff's claim that the Appellate Court improperly determined that he had not adequately pleaded the continuing course of conduct doctrine in avoidance of the defendant's statute of limitations defense in accordance with Practice Book § 10-57. Specifically, the plaintiff contends that his reply to the defendant's special defense, coupled with the allegations set forth in his complaint, adequately invoked the continuing course of conduct doctrine. Contending that there is an absence of any "legal authority to support . . . a pleading requirement that the continuing course of conduct doctrine be specifically labeled as such," the plaintiff emphasizes that pleadings should be read "broadly and realistically, rather than narrowly and technically"; (internal quotation marks omitted) *Collins* v. *Anthem Health Plans, Inc.*, 266 Conn. 12, 24, 836 A.2d 1124 (2003); and that "he included the essential elements of the continuing course of conduct doctrine within his pleading of avoidance of limitations," which should be read in context with the specific factual allegations in the complaint. The plaintiff further notes that the continuing course of conduct doctrine was briefed and argued before the trial court, and was supported by the parties' evidentiary submissions in connection with the defendant's summary judgment motion.

In response, the defendant contends that the plaintiff's invocation of the continuing course of conduct doctrine was inadequate because his pleadings referenced only "concealment doctrines," "[did] not even use the word 'continuing' " and lacked necessary allegations as to either MacGrady or the defendant that would implicate the doctrine. Citing *Beckenstein Enterprises-Prestige Park, LLC* v. *Keller*, supra, 115 Conn. App. 680, the defendant emphasizes that the plaintiff did not comply with Practice Book § 10-57. See footnote 17 of this opinion. We agree with the plaintiff and conclude that, on this record, the Appellate Court should have reached the merits of the plaintiff's claims because the trial court and the defendant were sufficiently apprised of the continuing course of conduct issue by his pleadings and memoranda of law.

The applicable standard of review is undisputed and well established. "The interpretation of pleadings is always a question of law for the court . . . . Our review of the trial court's interpretation of the pleadings therefore is plenary. . . . Furthermore, we long have eschewed the notion that pleadings should be read in a hypertechnical manner. Rather, [t]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically. . . . [T]he complaint must be read in its entirety in such a way as to give effect to the pleading

with reference to the general theory upon which it proceeded, and do substantial justice between the parties. . . . Our reading of pleadings in a manner that advances substantial justice means that a pleading must be construed reasonably, to contain all that it fairly means, but carries with it the related proposition that it must not be contorted in such a way so as to strain the bounds of rational comprehension." (Citation omitted; internal quotation marks omitted.) *Grenier* v. *Commissioner of Transportation*, 306 Conn. 523, 536, 51 A.3d 367 (2012). "[T]he practice of reading pleadings broadly applies to special defenses as well." *Travelers Ins. Co.* v. *Namerow*, 261 Conn. 784, 796, 807 A.2d 467 (2002). "As long as the pleadings provide sufficient notice of the facts claimed and the issues to be tried and do not surprise or prejudice the opposing party, we will not conclude that the complaint is insufficient to allow recovery." (Internal quotation marks omitted.) Id., 795.

Practice Book § 10-57 provides in relevant part that "[m]atter in avoidance of affirmative allegations in an answer or counterclaim shall be specially pleaded in the reply. . . ." Under § 10-57, "the continuing course of conduct doctrine is a matter that must be pleaded in avoidance of a statute of limitations special defense." *Beckenstein Enterprises-Prestige Park, LLC* v. *Keller*, supra, 115 Conn. App. 688, citing *Bellemare* v. *Wachovia Mortgage Corp.*, 94 Conn. App. 593, 607 n.7, 894 A.2d 335 (2006), aff'd, 284 Conn. 193, 931 A.2d 916 (2007); accord *Beckenstein* v. *Potter & Carrier, Inc.*, 191 Conn. 150, 163, 464 A.2d 18 (1983) ("[i]n order to raise a claim of fraudulent concealment, the party challenging a statute of limitations defense must affirmatively plead it").

Thus, in *Beckenstein Enterprises-Prestige Park, LLC*, the case on which the Appellate Court relied in rejecting the plaintiff's claim in the present case; see *Flannery* v. *Singer Asset Finance Co., LLC*, supra, 128 Conn. App. 514; the Appellate Court concluded that the trial court properly declined to charge a jury on the continuing course of conduct doctrine, noting that "the plaintiffs had not pleaded the existence of a continuing course of conduct in avoidance of the statute of limitations defense"; *Beckenstein Enterprises-Prestige Park, LLC* v. *Keller*, supra, 115 Conn. App. 688; but rather, had replied only with a general denial. The Appellate Court rejected the plaintiffs' claim that "they were not required to plead the continuing course of conduct doctrine in response to the defendants' special defense because the factual allegations supporting the application of the doctrine were contained in the complaint." Id.

*Beckenstein Enterprises-Prestige Park, LLC*, does not, however, stand for the proposition that the pleading requirements are so rigid as to require that potentially meritorious claims in avoidance of the statute of limitations be categorically barred in all cases because of

pleading lapses. Beyond the trial courts' discretion to overlook violations of the rules of practice in the absence of a timely objection from the opposing party; see, e.g., *Schilberg Integrated Metals Corp.* v. *Continental Casualty Co.*, 263 Conn. 245, 273, 819 A.2d 773 (2003); it may be just to reach the merits of a plaintiff's claim to a toll of the statute of limitations, even when not properly pleaded pursuant to Practice Book § 10-57, if the issue is otherwise put before the trial court and no party is prejudiced by the lapse in pleading. For example, in *Bellemare* v. *Wachovia Mortgage Corp.*, supra, 94 Conn. App. 607, the Appellate Court deemed it "just" to reach the merits of a plaintiff's claim that the statute of limitations was tolled by the continuing course of conduct doctrine, despite the plaintiff's failure to plead the doctrine properly pursuant to Practice Book § 10-57, when the plaintiff asserted the doctrine's applicability "for the first time in a pleading filed in opposition to the defendant's motion for summary judgment," observing that "however imperfectly, the plaintiff placed the issue before the court . . . ." See also *Mollica* v. *Toohey*, 134 Conn. App. 607, 611 n.3, 39 A.3d 1202 (2012) (reviewing plaintiffs' continuing course of conduct claim because, although they failed to plead that issue in avoidance of special defense, defendant did not object in trial court when plaintiffs raised doctrine in their objection to his summary judgment motion).

In determining whether a party's failure to "specially plead" entitlement to a particular toll of the statute of limitations pursuant to Practice Book § 10-57 is prejudicial to its adversary, we find instructive case law applying, in the context of statute of limitations defenses, Practice Book § 10-3 (a),[18] which requires parties to "specifically [identify] by its number" in their pleadings the statutory provisions that form the bases for their claims. In that analogous context, our courts have held the pleading requirement to be "directory rather than mandatory. . . . *As long as the defendant is sufficiently apprised of the nature of the action . . . the failure to comply with the directive of . . . § 10-3 (a) will not bar recovery.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *Spears* v. *Garcia*, 66 Conn. App. 669, 675–76, 785 A.2d 1181 (2001), aff'd, 263 Conn. 22, 818 A.2d 37 (2003); see also, e.g., *Rocco* v. *Garrison*, 268 Conn. 541, 556–57, 848 A.2d 352 (2004) (permitting plaintiff's resort to improperly cited accidental failure of suit statute because "there is no indication that the defendant was misled by the plaintiffs' incorrect citation"). In the statute of limitations context in particular, the Appellate Court has deemed nonjurisdictional statute of limitations defenses to be waived only when the record demonstrates that a party has been prejudicially confused by its adversary's failure to comply with the direction of Practice Book § 10-3 (a). Compare, e.g., *Cue Associates, LLC* v. *Cast Iron*

*Associates, LLC*, 111 Conn. App. 107, 116–17, 958 A.2d 772 (2008) (limitations defense waived where, as to particular claim, plaintiff unaware that defendant was asserting it), and *Ramondetta* v. *Amenta*, 97 Conn. App. 151, 163–64, 903 A.2d 232 (2006) (defense to counterclaim waived when "[a]t no point from the filing of the defendant's counterclaim to the rendering of judgment by the court did the plaintiffs identify the applicable statute on which they relied"), with *Altfeter* v. *Naugatuck*, 53 Conn. App. 791, 802, 732 A.2d 207 (1999) (permitting defendant's reliance on statute not raised as special defense or identified in summary judgment motion, but cited in accompanying memorandum). Thus, we conclude that the plaintiff's failure to plead specifically his entitlement to a particular tolling doctrine pursuant to Practice Book § 10-57, while not a good practice, does not operate as a bar or waiver of that doctrine if the record demonstrates that the defendant, nevertheless, was sufficiently apprised of the plaintiff's intention to rely on that doctrine and that the defendant has not been prejudiced by the plaintiff's lapse in pleading.

Having thoroughly reviewed the record in this case, we conclude that the Appellate Court improperly upheld the trial court's determination that the plaintiff waived his right to assert the continuing course of conduct doctrine in avoidance of the defendant's statute of limitations special defense by failing to plead specific entitlement to that doctrine pursuant to Practice Book § 10-57. Although it would have been a far better practice for the plaintiff to use the words "continuing course of conduct" in his pleading in avoidance, the record demonstrates that the defendant was sufficiently apprised of the plaintiff's intent to rely on that doctrine and suffered no prejudice as a result of the plaintiff's lapse in pleading.[19] Specifically, the plaintiff's analysis in his memorandum of law in opposition to the defendant's summary judgment motion sufficiently evokes the continuing course of conduct doctrine by arguing that, "[i]n aiding and abetting MacGrady in the breach of his fiduciary duties, [the defendant's] liability is also vicarious, derivative and coextensive with that of MacGrady . . . including with respect to applying the statute of limitations. In each case, the nature of the fiduciary misconduct gives rise to a tolling of limitations by application of the continuous course of conduct doctrine." After discussing the various factual allegations in the case in detail, the plaintiff then emphasized the "vicarious and derivative" nature of the aiding and abetting cause of action, thus contending that "limitations is tolled as to [the defendant] for the same reasons as it is tolled for [MacGrady and Pepe & Hazard]."[20]

The defendant's reply memorandum of law in support of its motion for summary judgment contains a lengthy responsive discussion of the continuing course of conduct doctrine and its inapplicability to this case. More-

over, the applicability of the continuing course of conduct doctrine was argued in detail orally twice before the trial court—once in connection with the summary judgment motion filed by the MacGrady and Pepe & Hazard; see footnote 3 of this opinion; and several weeks later in connection with the defendant's motion, focusing in particular on whether MacGrady's action of referring the plaintiff to the tax appeal group for people with similar tax issues continued his previous course of conduct. The record indicates, therefore, that the defendant was not prejudiced by the plaintiff's apparent lapse in pleading, notwithstanding its objection before the trial court, which was renewed in the Appellate Court.[21] Thus, we conclude that both the Appellate Court and the trial court should have reached the merits of the plaintiff's continuing course of conduct claims in avoidance of the defendant's statute of limitations defenses.

## II

We turn to the defendant's alternative ground for affirmance, namely, that the admitted or undisputed facts of this case preclude the application of the continuing course of conduct doctrine to toll the governing three year statutes of limitations as a matter of law. The defendant claims that the continuing course of conduct doctrine is inapplicable because, indisputably, it had no special relationship with the plaintiff and, therefore, had no duty to disclose anything to the plaintiff, and it did not engage in any additional wrongdoing toward, or have any further contact with, the plaintiff following the close of the lottery transaction in 1999. Moreover, according to the defendant, the fiduciary status and/or conduct of MacGrady should not, as a matter of law, be attributed to the defendant, an alleged aider and abettor, for purposes of applying the continuing course of conduct doctrine. Finally, the defendant contends, even if a principal actor's status and conduct properly are attributed to an aider and abettor for purposes of tolling a statute of limitations, there is no genuine issue of material fact regarding whether MacGrady, in the three years following the close of the lottery transaction, breached any continuing duty to the plaintiff by engaging in subsequent wrongful conduct related to his earlier wrongful acts. Specifically, the defendant argues, MacGrady's October, 2002 act of referring the plaintiff to the tax appeal group occurred *after* the three year statutes of limitations already had expired,[22] and furthermore, because the attorney-client relationship between MacGrady and the plaintiff ceased to exist in September, 1999, once the lottery transaction was complete, the statutes were not tolled in the years subsequent to that transaction by MacGrady's continuing failure to disclose his prior conflict of interest.

The plaintiff disagrees with the defendant, arguing that MacGrady's fiduciary status and conduct properly

are attributable to the defendant for tolling purposes, and that MacGrady engaged in a continuing course of conduct by committing a fraud in connection with the lottery transaction, by promising, contemporaneously with that transaction, to represent the plaintiff anew if he had trouble with the IRS, by continually failing to disclose his conflict of interest subsequent to the close of the transaction, and by referring the plaintiff to the tax appeal group in October, 2002. According to the plaintiff, despite the lack of an ongoing fiduciary relationship, MacGrady's duty to disclose the conflict of interest to the plaintiff continued indefinitely, until such disclosure was made, and, therefore, his ongoing failure to disclose constituted a continuing breach of that duty that tolled the statutes of limitations. Moreover, the plaintiff contends, the October, 2002 referral was a further extension of the breach.

Even if we were to assume, without deciding, that the status and/or subsequent wrongful conduct of a principal tortfeasor should be attributed to an alleged aider and abettor for purposes of tolling a statute of limitations, we agree with the defendant that that assumption could not aid the plaintiff on the undisputed facts of this case.[23] Specifically, MacGrady's initial breach of his fiduciary duty, which was based on a conflict of interest, concluded at the latest in September, 1999, after the lottery transaction closed and he ceased to represent the plaintiff, and his subsequent act of referring the plaintiff to the tax appeal group occurred in October, 2002. The subsequent act, therefore, occurred *after* the three year statutes of limitations already had expired, and it was of no consequence for tolling purposes. Additionally, because the attorney-client relationship between MacGrady and the plaintiff clearly ended in September, 1999, MacGrady no longer had a duty, in the years that followed, to disclose his prior conflict of interest that no longer existed. Thus, his ongoing nondisclosure was not a continuing breach of such a duty that could toll the statute of limitations indefinitely. For these reasons, we conclude that the trial court properly held that the plaintiff's action against the defendant is time barred.

We begin with the standard of review. "The standards governing [an appellate tribunal's] review of a trial court's decision to grant a motion for summary judgment are well established. Practice Book [§ 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles

of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. . . . . A material fact . . . [is] a fact which will make a difference in the result of the case. . . . Finally, the scope of our review of the trial court's decision to grant the [defendant's] motion for summary judgment is plenary. . . . Summary judgment may be granted where the claim[s] [are] barred by the statute of limitations. . . . Summary judgment is appropriate on statute of limitations grounds when the material facts concerning the statute of limitations [are] not in dispute . . . ." (Citations omitted; internal quotation marks omitted.) *Romprey* v. *Safeco Ins. Co. of America*, 310 Conn. 304, 312–13, 77 A.3d 726 (2013).

"[I]n the context of a motion for summary judgment based on a statute of limitations special defense, a defendant typically meets its initial burden of showing the absence of a genuine issue of material fact by demonstrating that the action had commenced outside of the statutory limitation period. . . . When the plaintiff asserts that the limitations period has been tolled by an equitable exception to the statute of limitations, the burden normally shifts to the plaintiff to establish a disputed issue of material fact in avoidance of the statute. See, e.g., *Zielinski* v. *Kotsoris*, 279 Conn. 312, 330, 901 A.2d 1207 (2006) (no genuine issue of material fact as to whether statute of limitations was tolled under continuing course of treatment or continuing course of conduct doctrine); *Witt* v. *St. Vincent's Medical Center*, 252 Conn. 363, 369–70, 746 A.2d 753 (2000) (genuine issue of material fact as to whether continuous course of conduct doctrine tolled statute of limitations in medical malpractice claim) . . . ." (Citations omitted.) *Romprey* v. *Safeco Ins. Co. of America*, supra, 310 Conn. 321–22.[24]

The statutes of limitations applicable in the present case are occurrence statutes. See footnote 4 of this opinion. With such statutes, the limitations period typically begins to run as of the date the complained of conduct occurs, and not the date when the plaintiff first discovers his injury. *Watts* v. *Chittenden*, 301 Conn. 575, 583, 22 A.3d 1214 (2011). In certain circumstances, however, we have recognized the applicability of the continuing course of conduct doctrine to toll a statute of limitations. Tolling does not enlarge the period in which to sue that is imposed by a statute of limitations, but it operates to suspend or interrupt its running while certain activity takes place. *Romprey* v. *Safeco Ins. Co. of America*, supra, 310 Conn. 330 (*McDonald, J.*, dissenting). Consistent with that notion, "[w]hen the wrong sued upon consists of a continuing course of conduct, the statute does not begin to run until that course of conduct is completed." *Handler* v. *Remington Arms Co.*, 144 Conn. 316, 321, 130 A.2d 793 (1957).

The test for determining whether the continuing course of conduct doctrine should apply has developed primarily in negligence cases. "For instance, we have recognized the continuing course of conduct doctrine in claims of medical malpractice. . . . In doing so, we noted that [t]he continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied. . . . The continuing course of conduct doctrine has also been applied to other claims of professional negligence in this state. . . .

"In these negligence actions, this court has held that in order [t]o support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong. . . . Where we have upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act. . . .

"Therefore, a precondition for the operation of the continuing course of conduct doctrine is that the defendant must have committed an initial wrong upon the plaintiff. . . .

"A second requirement for the operation of the continuing course of conduct doctrine is that there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. . . . This court has held this requirement to be satisfied when there was wrongful conduct of a defendant related to the prior act." (Citations omitted; internal quotation marks omitted.) *Watts* v. *Chittenden*, supra, 301 Conn. 583–85. Such later "wrongful conduct may include acts of omission as well as affirmative acts of misconduct . . . ." *Blanchette* v. *Barrett*, 229 Conn. 256, 264, 640 A.2d 74 (1994).

In sum, "[i]n deciding whether the trial court properly granted the defendant's motion for summary judgment, we must determine if there is a genuine issue of material fact with respect to whether the defendant: (1) committed an initial wrong upon the plaintiff; (2) owed a continuing duty to the plaintiff that was related to the alleged original wrong; and (3) continually breached that duty." *Witt* v. *St. Vincent's Medical Center*, supra, 252 Conn. 370.

It is clear that in the present matter, the foregoing test cannot be satisfied by looking to the actions of the defendant. The plaintiff claimed that the defendant

aided and abetted MacGrady in committing an initial wrong, namely, MacGrady's breach of his fiduciary duty contemporaneous with the sale of the plaintiff's lottery winnings in mid-1999. The plaintiff, however, has not alleged or pointed to any evidence of any duty owed by, or further misconduct on the part of, the defendant following that sale. In regard to the lottery transaction, the defendant and the plaintiff stood in relation of buyer and seller and, as such, there was no special relationship between them that imposed upon the defendant a duty to disclose to the plaintiff any deception attendant to the transaction. See *Fichera* v. *Mine Hill Corp.*, supra, 207 Conn. 210. Moreover, there is no evidence that suggests that the defendant had *any* further contact with the plaintiff following that transaction, let alone that it engaged in any additional related wrongdoing toward the plaintiff.

The plaintiff argues, however, that because the defendant aided and abetted MacGrady's commission of an initial wrong upon him, and because thereafter, *MacGrady* continually breached a related continuing duty, the statutes of limitations are tolled as to both his claims against MacGrady *and his claims against the defendant*. Even if we were to assume that the plaintiff's view of the law is correct, we disagree that tolling applies to save the claims alleged against the defendant in this case, because the undisputed facts show no continuing course of conduct by *either* the defendant or MacGrady.

There is no dispute that in mid-1999, MacGrady committed an initial wrong upon the plaintiff. By representing the plaintiff in connection with the sale of his lottery winnings to the defendant, while simultaneously engaged professionally with the defendant and failing to disclose that circumstance to the plaintiff, MacGrady acted pursuant to an obvious conflict of interest[25] and, consequently, breached the fiduciary duty he owed to the plaintiff which arose from the attorney-client relationship. Nevertheless, subsequent to that initial breach, MacGrady no longer owed a continuing duty to the plaintiff that he continued to breach, either by committing later misconduct that was related to his initial wrongful act or because there was an ongoing special relationship between him and the plaintiff.

As we have explained, the lottery transaction closed in June, 1999, and, by the clear terms of the retainer agreement, MacGrady ceased to represent the plaintiff entirely in September, 1999. See footnote 9 of this opinion. As evidence of later wrongful misconduct, the plaintiff cites MacGrady's act, in October, 2002, of referring the plaintiff to the tax appeal group. We disagree that that act, even if wrongful,[26] could toll or, more accurately, revive, the three year statutes of limitations because by that time, those statutes already had run.

In *Watts* v. *Chittenden*, supra, 301 Conn. 595–98, a case in which we determined that the continuing course

of conduct doctrine was available to toll the statute of limitations for a claim of intentional infliction of emotional distress, we emphasized that portions of such claims would be disallowed, as with any continuing tort, when the instances of wrongdoing comprising the course of conduct are separated by a gap that exceeds the length of the applicable statute of limitations. In such cases, although the course of conduct postdating such a gap may remain actionable (so long as the action is timely commenced from the last instance of misconduct), recovery is barred for the instances of misconduct predating the gap. See also id., 612 (*McLachlan, J.*, dissenting) ("[o]ther jurisdictions have recognized that a course of conduct ceases when followed by a significant gap before the misconduct resumes"); id., 613 (*McLachlan, J.*, dissenting) ("[o]rdinarily, when a course of conduct ceases and is followed by a gap, the statute of limitations is tolled *if the tortfeasor engages in the* [*subsequent*] *misconduct before the limitations period has run*" [emphasis added]). In other words, in a tort action, following an initial wrong, the subsequent activity triggering tolling "itself must occur before the three-year statute of limitations has run, to effectively toll it." *Greene* v. *Morgan, Theeler, Cogley & Petersen*, 575 N.W.2d 457, 460 (S.D. 1998).

In the present matter, MacGrady's original wrongdoing ceased in September, 1999, after the plaintiff sold his lottery winnings to the defendant and MacGrady's representation of the plaintiff, and any conflict of interest due to MacGrady's simultaneous representation of the defendant, ended. Accordingly, when MacGrady resumed his presumably wrongful course of conduct in October, 2002, more than three years later, when he advised the plaintiff to join a tax appeal group, the three year statutes of limitations already had run. Because the gap between instances of alleged wrongful conduct exceeds the length of the three year statutes of limitations for breach of a fiduciary duty and CUTPA claims, no tolling is available under the rule stated in *Watts* v. *Chittenden*, supra, 301 Conn. 583–85. Accordingly, the plaintiff's 2005 breach of a fiduciary duty claim against MacGrady based on his conduct in 1999 was untimely. By extension, the plaintiff's aiding and abetting claim against the defendant, as to its actions in 1999, also is untimely, even if the plaintiff is correct that MacGrady's conduct properly is imputed to the defendant for tolling purposes.

The plaintiff attempts to bridge this fatal gap between instances of wrongful activity by citing the special relationship between himself and MacGrady, which, in the plaintiff's view, gave rise to MacGrady's ongoing duty to disclose to the plaintiff his dealings with the defendant. According to the plaintiff, MacGrady's duty to disclose those dealings continued indefinitely, until it was satisfied, and as long as that duty remained unsatisfied, MacGrady was in breach of it such that the statutes of

limitations were tolled. We are not persuaded.[27]

As to the existence of a special relationship, there is no question that MacGrady, during the period of time he acted as the plaintiff's attorney, had fiduciary responsibilities and an associated duty of loyalty toward the plaintiff; see *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 56, 717 A.2d 724 (1998) ("an attorney-client relationship imposes a fiduciary duty on the attorney"); *Matza* v. *Matza*, 226 Conn. 166, 184, 627 A.2d 414 (1993) ("[t]he relationship between an attorney and his client is highly fiduciary in its nature and of a very delicate, exacting, and confidential character, requiring a high degree of fidelity and good faith" [internal quotation marks omitted]); and that MacGrady should not have represented the plaintiff without disclosing his concurrent relationship with the defendant. See Rules of Professional Conduct 1.7; see also footnote 25 of this opinion. Pursuant to the clear terms of the retainer agreement governing the relationship, however, MacGrady's brief representation of the plaintiff was of very limited scope, and it quickly came to a close when the lottery transaction was completed and the plaintiff received his final bill for services rendered, in September, 1999. See footnote 9 of this opinion; see also *DeLeo* v. *Nusbaum*, 263 Conn. 588, 597, 821 A.2d 744 (2003) ("formal termination of the [attorney-client] relationship occurs when . . . the matter for which the attorney was hired comes to a conclusion"). Once that representation ceased, any remaining duties MacGrady owed to the plaintiff as a former client were limited and did not include, as the plaintiff contends, an indefinite duty to inform him of the prior conflict of interest that no longer existed.[28]

Consistent with the foregoing, Connecticut's appellate jurisprudence addressing the continuing course of conduct doctrine in the attorney-client context largely has held it to be inapplicable when the legal representation at issue has come to a close and there is no further contact between the parties. These cases generally reject the notion that the attorney has a continuing duty to the client to correct or report an earlier wrong that, if left unsatisfied, would toll the statute of limitations.[29] They recognize that imposing a continuing duty in such circumstances is futile because, once representation ceases, the initial wrong typically is complete, and in the usual situation, it no longer can be undone by the attorney. See, e.g., *Robbins* v. *McGuiness*, 178 Conn. 258, 261–62, 423 A.2d 897 (1979) (no continuing duty to warn former client about results of title search performed in connection with completed land transaction); *Lee* v. *Brenner, Saltzman & Wallman, LLP*, 128 Conn. App. 250, 251, 258–59, 15 A.3d 1215 (no continuing duty to warn plaintiff of alleged breach of fiduciary duty in connection with concluded representation, which involved drafting of corporation's employment and stockholder agreements), cert. denied, 301 Conn. 926,

22 A.3d 1277 (2011); *Sanborn* v. *Greenwald*, 39 Conn. App. 289, 297, 664 A.2d 803, cert. denied, 235 Conn. 925, 666 A.2d 1186 (1995) (no continuing duty to warn former client of consequences of negligently drafted stipulation); but see *Targonski* v. *Clebowicz*, 142 Conn. App. 97, 110–11, 63 A.3d 1001 (2013) (defendant attorney had ongoing duty to notify former clients of his failure to secure right-of-way in connection with land purchase, where, subsequent to closing, sellers' attorney repeatedly contacted defendant offering to execute easement agreement).[30]

In the present case, as in *Robbins*, *Sanborn*, and *Lee*, the attorney, MacGrady, represented the plaintiff client for a discrete matter only, after which the attorney-client relationship clearly was terminated. After the attorney-client relationship between the plaintiff and MacGrady came to a close, any conflict of interest ceased to exist and, moreover, no further dealings between the plaintiff and MacGrady were contemplated. Once the plaintiff sold his lottery winnings to the defendant, the transaction that was the subject of the representation was complete, and it could be neither undone nor recompleted with MacGrady's conflict of interest properly disclosed and waived. See Rules of Professional Conduct 1.7; see also footnote 25 of this opinion. Accordingly, nothing would change were MacGrady to disclose to the plaintiff, retroactively, the preexisting conflict. We conclude, therefore, that under the circumstances of this case, MacGrady did not have a continuing duty to disclose his prior conflict of interest that he continually breached by failing to disclose it.[31]

"The gravamen of the continuing course of conduct doctrine is that a duty continues after the original wrong is committed." *Golden* v. *Johnson Memorial Hospital, Inc.*, 66 Conn. App. 518, 525, 785 A.2d 234, cert. denied, 259 Conn. 902, 789 A.2d 990 (2001). "[I]n the absence of a continuing special relationship, there must be a subsequent wrongful act that is related to the prior negligence." (Internal quotation marks omitted.) *Witt* v. *St. Vincent's Medical Center*, supra, 252 Conn. 371. In the present matter, in which no continuing special relationship exists, the plaintiff essentially requests that the three year statutes of limitations be tolled, indefinitely, on the basis of his former attorney's ongoing failure to confess his earlier tortious act. To accept this argument, however, would render the three year statutes of limitations meaningless. Cf. *Fitzgerald* v. *Seamans*, 553 F.2d 220, 230 (D.C. Cir. 1977) (explaining, in rejecting plaintiff's claim that statute of limitations was tolled in wrongful retaliatory discharge action on ground of continuing conspiracy to deny him rightful employment, when plaintiff did not specify any retaliatory actions taken by defendants within limitations period, that "the mere failure to right a wrong and make [the] plaintiff whole cannot be a continuing wrong

which tolls the statute of limitations, for that is the purpose of any lawsuit and the exception would obliterate the rule").[32]

For the foregoing reasons, we conclude that the undisputed evidence does not show a continuing course of conduct on the part of MacGrady subsequent to the lottery transaction in 1999. Accordingly, even if MacGrady's continuing course of conduct properly is attributable to the defendant for tolling purposes, the plaintiff's claims against the defendant remain untimely.

"The purposes of statutes of limitation include finality, repose and avoidance of stale claims and stale evidence." *Connecticut Bank & Trust Co.* v. *Winters*, 225 Conn. 146, 157 n.20, 622 A.2d 536 (1993). These statutes "represent a legislative judgment about the balance of equities in a situation involving the tardy assertion of otherwise valid rights: [t]he theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." (Internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 682, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006).

Although the conduct alleged by the plaintiff in his complaint undeniably is reprehensible, the policy considerations underlying statutes of limitations clearly are implicated by the substantial amount of time that has elapsed between the acts complained of and the filing of this action. Although this alone would not bar the plaintiff's claims were the statutes of limitations amenable to tolling under the continuous course of conduct doctrine, for the reasons we have explained herein, on the undisputed facts of this case, they are not.

The judgment of the Appellate Court is affirmed.

In this opinion PALMER, ZARELLA and LAVINE, Js., concurred.

\* This case originally was argued before a panel of this court consisting of Chief Justice Rogers and Justices Norcott, Palmer, Zarella and Eveleigh. Thereafter, the court, pursuant to Practice Book § 70-7 (b), sua sponte, ordered that the case be considered en banc. Accordingly, Judges Espinosa and Lavine were added to the panel, and they have read the record and briefs and listened to a recording of the oral argument prior to participating in this decision.

The listing of justices reflects their seniority status on this court as of the date of oral argument.

[1] Like the Appellate Court, we note that the correct spelling of the plaintiff's last name is Flanery. *Flannery* v. *Singer Asset Finance Co., LLC*, 128 Conn. App. 507, 508 n.1, 17 A.3d 509 (2011). For the purpose of consistency, however, we maintain the name Flannery in both the caption of this case and internal citations in conformity with the pleadings, judgment file and Appellate Court opinion.

[2] We granted the plaintiff's petition for certification limited to the following issues: "1. Did the Appellate Court properly determine, in a case alleging that the defendant [Singer Asset Finance Company, LLC] aided and abetted [Attorney Glenn MacGrady and Pepe & Hazard, LLP] in a breach of their fiduciary duty, that the allegations contained in both the plaintiff's complaint and in avoidance of a statute of limitations defense were insufficient to invoke the continuous course of conduct doctrine as a means of tolling the

statute of limitations?

"2. Did the Appellate Court properly determine that the three year statute of limitations period for actions brought under the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq., cannot be tolled?" *Flannery* v. *Singer Asset Finance Co.*, *LLC*, 302 Conn. 902, 902–903, 23 A.3d 1242 (2011).

[3] "Attorney Glenn MacGrady and Pepe & Hazard, LLP, also were defendants in this case. Partial summary judgment was rendered in their favor on June 18, 2009, and the plaintiff, thereafter, withdrew all remaining claims against these defendants. Accordingly, MacGrady and Pepe & Hazard, LLP, are not parties to this appeal. We will refer only to Singer Asset Finance Company, LLC, as the defendant for purposes of this opinion." *Flannery* v. *Singer Asset Finance Co.*, *LLC*, 128 Conn. App. 507, 509 n.2, 17 A.3d 509 (2011).

[4] General Statutes § 52-577 provides that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of," and is applicable to claims of breach of a fiduciary duty. *Ahern* v. *Kappalumakkel*, 97 Conn. App. 189, 192 n.3, 903 A.2d 266 (2006).

General Statutes § 42-110g (f), which governs CUTPA claims, provides: "An action under this section may not be brought more than three years after the occurrence of a violation of this chapter."

[5] Because we conclude that the undisputed facts preclude tolling as to both of the plaintiff's claims, we need not decide whether *Fichera* v. *Mine Hill Corp.*, supra, 207 Conn. 204, also precludes tolling of the CUTPA claim.

[6] The recited facts largely reflect the allegations of the plaintiff's complaint. The defendant denied all of the plaintiff's allegations of its wrongdoing, but its summary judgment motion assumed, for argument's sake, that those allegations were true.

[7] In 1998, the defendant's general counsel had provided MacGrady with a confidential legal memorandum on the capital gains treatment of lottery winnings that the accounting firm of Deloitte & Touche, LLP, had authored for the defendant. Moreover, the defendant's telephone records from early 1999 disclose that it communicated with MacGrady regarding a potential transaction with the plaintiff.

[8] "The plaintiff points out: 'It is worth repeating in this public document that the evidence supports the conclusion that the law firm of Pepe & Hazard, [LLP] at the time inexperienced in the tax matters, was not specifically aware of what [A]ttorney MacGrady was up to with [the defendant]. That when [Pepe & Hazard, LLP] became aware of what its employee was doing with [the defendant] that it put a stop to it and soon after discharged MacGrady.' " *Flannery* v. *Singer Asset Finance Co.*, *LLC*, supra, 128 Conn. App. 510 n.3.

[9] The retainer agreement was comprised of a March 25, 1999 letter from MacGrady to the plaintiff and an appended document outlining Pepe & Hazard's standard terms of engagement. The letter provided in relevant part: "The purpose of this letter is to outline the scope of the legal engagement, to disclose to you our relationship with lottery purchase companies, and to state our fees. *The scope of the legal engagement is to represent you in negotiating a lottery sale contract, to help you evaluate the tax and other legal consequences of such a transaction, and to draft or review all the legal and court documents needed to execute such a transaction.*

"Pepe & Hazard does not represent any lottery purchase company or broker. Our only involvement with such organizations is that I have represented several other lottery winners in complex negotiations with them. In that process, I have become very familiar with lottery purchase procedures and contracts. I believe my name was suggested to you solely because certain lottery purchase companies respect my professional ability as well as my contract and tax knowledge. Our firm has no other relationship with them. If you retain us, my firm will aggressively represent you to the best of our abilities. . . .

"A detailed description of our firm policies is contained in the enclosed Standard Terms of Engagement for Legal Services. . . .

"To confirm this engagement, please sign below on the enclosed copy of this letter to indicate your understanding of and agreement to the terms." (Emphasis added.) The plaintiff signed the letter agreement on March 26, 1999.

The appended document, entitled "Standard Terms of Engagement for Legal Services," stated in its introductory paragraph that the document "contains the standard terms of our engagement as your lawyers. Unless modified in writing by mutual agreement, these terms will be an integral part of our agreement with you." Under the heading of "Scope of Pepe &

Hazard's Representation," the document provided further that "[t]he scope of legal services we will provide is described in the accompanying engagement letter," and that "[i]t is also our policy that *the attorney-client relationship will be considered terminated upon our completion of any services that you have retained us to perform.* If you later retain us to perform additional services, our attorney-client relationship will be revived subject to these terms of engagement, as they may be supplemented at that time." (Emphasis added.) Finally, under the heading "Ending Your Relationship with Us," the document provided that "[u]nless previously terminated, *our representation of you with respect to the agreed upon scope of representation will terminate upon sending you our final statement for services rendered*," and that "[y]ou are engaging us to provide legal services in connection with an agreed upon scope of representation. After completion of the representation, changes may occur in the applicable laws or regulations that could have an impact upon your future rights and liabilities. *Unless you actually engage us after the closing to provide additional advice on issues arising from this representation, we have no continuing obligation to advise you with respect to future legal developments.*" (Emphasis added.)

[10] Specifically, MacGrady agreed that he would, when requested by the defendant, "communicate [his] current independent legal opinion on the taxation of lottery assignments to persons and audiences selected by" the defendant, including lottery winners and their professional advisers. He further agreed to write a scholarly article setting forth his current legal opinion on the taxation of lottery assignments. The retainer agreement stated that MacGrady's opinion would be "balanced, neutral and unbiased," and would neither favor nor disfavor the defendant's economic interests. At the same time, however, the agreement provided that the defendant would compensate MacGrady at his hourly rate for the services performed and, in its discretion, would pay a "performance bonus for any lottery assignment transaction closed by [the defendant] in which the services provided hereunder by [Pepe & Hazard] is a significant contributing factor."

[11] Billing records produced by Pepe & Hazard indicate that MacGrady continued to provide professional services to the defendant, unrelated to the lottery sale to the plaintiff, until September, 2000.

[12] The Appellate Court assumed, without deciding, "that Connecticut recognizes an action for aiding and abetting in the breach of a fiduciary duty. See *Efthimiou* v. *Smith*, 268 Conn. 499, 504–507, 846 A.2d 222 (2004) (discussing claim of aiding and abetting in breach of fiduciary duty)." *Flannery* v. *Singer Asset Finance Co., LLC*, supra, 128 Conn. App. 511 n.4. In *Efthimiou*, although recognition of such a cause of action was unnecessary for the disposition of the appeal, this court quoted *Halberstam* v. *Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983), for the proposition that, "[a]iding-abetting includes the following elements: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation . . . ." (Internal quotation marks omitted.) *Efthimiou* v. *Smith*, supra, 505. Similar to *Efthimiou*, the present case does not require us to decide whether aiding and abetting a breach of a fiduciary duty is a viable cause of action in Connecticut, and we decline to do so in dicta.

[13] Specifically, the plaintiff alleged that MacGrady breached his fiduciary duty by giving the plaintiff erroneous tax advice, advising him to sell his lottery installment payments to the defendant, encouraging him to join the tax appeal group, and continually failing to disclose his business relationship with the defendant.

[14] The plaintiff also raised several claims against MacGrady and Pepe & Hazard, including, as to each, breach of a fiduciary duty and a CUTPA violation. Those claims are not at issue in this appeal. *See* footnote 3 of this opinion.

[15] Specifically, the plaintiff's pleading in avoidance provided: "The defendant aided and abetted a fiduciary in concealing from the plaintiff and/or failing to make proper disclosures to the plaintiff of the wrongdoing set forth in the plaintiff's complaint that gives rise to the plaintiff's causes of action and as a result is barred and estopped from asserting statute of limitations defenses. The defendant fraudulently concealed from the plaintiff its wrongdoing set forth in the plaintiff's complaint that gives rise to the plaintiff's causes of action in violation of [General Statutes] § 52-595 and as a result is barred from asserting statute of limitations defenses."

[16] On appeal to the Appellate Court, the plaintiff also pursued his claim

of fraudulent concealment. *Flannery* v. *Singer Asset Finance Co., LLC*, supra, 128 Conn. App. 515. The Appellate Court rejected this claim; id., 515–17; and the plaintiff did not seek certification to appeal with respect to it. Accordingly, we need not discuss the claim further.

[17] Practice Book § 10-57 provides: "Matter in avoidance of affirmative allegations in an answer or counterclaim shall be specially pleaded in the reply. Such a reply may contain two or more distinct avoidances of the same defense or counterclaim, but they must be separately stated."

[18] Practice Book § 10-3 (a) provides: "When any claim made in a complaint, cross complaint, special defense, or other pleading is grounded on a statute, the statute shall be specifically identified by its number."

[19] In regard to this pleading issue, the plaintiff contends that the allegations set forth in his complaint are factually sufficient to support the invocation of the continuing course of conduct doctrine as articulated in, for example, *Watts* v. *Chittenden*, 301 Conn. 575, 585, 22 A.3d 1214 (2011). The defendant argues to the contrary, positing that the absence of certain allegations in the complaint, such as the existence of a "special relationship" between it and the plaintiff or any conduct between them after the closing of the sale, indicates that it could not have been expected to anticipate as a pleading matter the plaintiff's reliance on the continuing course of conduct doctrine, which also fails on its merits. We decline to intertwine our consideration of the merits of the plaintiff's continuing course of conduct claims with a determination of whether those claims are properly before the court. Put differently, that the factual allegations in the complaint conceivably could support application of this legal doctrine is not, by itself, sufficient to comply with the rules of practice, which are intended to avoid unfair surprise to the opposing parties and the court. Rather, what renders the merits of the plaintiff's claims reviewable at trial and on appeal is the fact that this record reveals that the plaintiff's pleading deficiencies plainly did not prejudice the defendant's statute of limitations defense.

[20] In contrast, we note, however, that the plaintiff's memoranda of law in opposition to Pepe & Hazard and MacGrady's motions for summary judgment discussed the continuing course of conduct doctrine in detail.

[21] Indeed, the record demonstrates that neither the plaintiff nor the defendant scrupulously adhered to the rules of practice by clearly indicating which statutes of limitation and doctrines in avoidance applied in this case. As the plaintiff noted before the trial court, however, he did not claim prejudice as a result of the defendant's failure to follow Practice Book § 10-3 (a) and to cite the applicable statute of limitations in its broadly worded special defense.

[22] On October 27, 2013, following oral argument in this court, we ordered the parties to submit supplemental briefs addressing the following question: "Was the plaintiff's underlying claim against . . . MacGrady and [Pepe & Hazard] time barred because more than three years had elapsed between the time of the claimed breach of the fiduciary duty in 1999 and MacGrady's subsequent referral of the plaintiff to the tax [appeal] group in October, 2002?" The rules for reviewing unpreserved claims of error articulated in *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 144–64, 84 A.3d 840 (2014), are not implicated because the issue on which briefing was ordered is but a facet of the preserved issue that the parties have raised and briefed, namely, whether the continuing course of conduct applies to render the plaintiff's action timely. Moreover, the supplemental briefing order predated the decision in *Blumberg Associates Worldwide, Inc.*, by several months.

[23] Even if the plaintiff's claim were not foreclosed by factual deficiencies, he has provided no legal authority, and little argument, in support of the questionable notion that a principal tortfeasor's conduct should be attributed to an alleged aider and abettor for purposes of tolling a statute of limitations, and the scant jurisprudence of which we are aware, which speaks only indirectly to the issue, does not favor the plaintiff's position. We agree with the plaintiff that, because "the limitations period on a cause of action for aiding and abetting a tort is the same as [that for] the underlying tort"; *Wizard Gaming, Inc.* v. *Joshi*, Docket No. B248174, 2014 WL 1047379, *5 (Cal. App. March 19, 2014); a claim of aiding and abetting the breach of a fiduciary duty is subject to the same statute of limitations as the claim of breach of a fiduciary duty against the principal tortfeasor, here, § 52-577. Id.; see also *Anderson* v. *Pine South Capital, LLC*, 177 F. Supp. 2d 591, 604 (W.D. Ky. 2001). Moreover, because the aiding and abetting claim is derivative of the primary breach of a fiduciary duty claim, if the primary claim is time barred, so is the aiding and abetting claim. See *Kaufman* v. *Cohen*,

307 App. Div. 2d 113, 124–25, 760 N.Y.S.2d 157 (2003); see also *Marshak* v. *Marshak*, 226 Conn. 652, 667–68, 628 A.2d 964 (1993) (viability of aiding and abetting claim dependent on viability of underlying cause of action), overruled on other grounds as stated in *State* v. *Vakilzaden*, 251 Conn. 656, 664, 742 A.2d 767 (1999).

The plaintiff has not established, however, that the inverse also is true, i.e., that if the claim against the primary tortfeasor is timely due to tolling, so, necessarily, is the claim against the alleged aider and abettor. Extrajurisdictional authority, concededly sparse, suggests otherwise. See, e.g., *Kaufman* v. *Cohen*, supra, 307 App. Div. 2d 121–26 (holding that fraud discovery accrual rule could operate to toll claims against principal tortfeasor, then concluding, by analyzing alleged aiders and abettors' own status and acts, that same tolling doctrine did not apply to toll claims against them); see also *Wultz* v. *Bank of China, Ltd.*, United States District Court, Docket No. 11-Civ.-266 (SAS), F.R.D. (2013), 2013 WL 1641179, *2–3 (S.D.N.Y. April 16, 2013) (analyzing applicability of equitable tolling to aiding and abetting claim by evaluating only actions of alleged aider and abettor); *Ingham* v. *Thompson*, 88 App. Div. 3d 607, 608, 931 N.Y.S.2d 306 (2011) (same); cf. *Lesti* v. *Wells Fargo Bank, N.A.*, 960 F. Supp. 2d 1311, 1321 (M.D. Fla. 2013) (looking only to behavior of alleged aider and abettor when determining whether statute of limitations on aiding and abetting claim has run).

According to the dissenting opinion, *Kaufman* v. *Cohen*, supra, 307 App. Div. 2d 125–27, *Ingham ex rel. Cobalt Asset Management, L.P.* v. *Thompson*, supra, 88 App. Div. 3d 608–609, and *Monaghan* v. *Ford Motor Co.*, 71 App. Div. 3d 848, 850, 897 N.Y.S.2d 482 (2010), provide support for the proposition that, if an aiding and abetting claim appears to have merit, the statute of limitations on that claim may be tolled on the basis of the principal tortfeasor's continuing course of conduct. None of those cases so hold, however, either directly or indirectly. In both *Kaufman* v. *Cohen*, supra, 125–27, and *Ingham ex rel. Cobalt Asset Management, L.P.* v. *Thompson*, supra, 608–609, the Appellate Division of the Supreme Court, in evaluating claims of aiding and abetting the breach of a fiduciary duty, simply concluded that those claims *both*: (1) lacked substantive merit; *and* (2) were untimely because certain tolling doctrines are inapplicable, after applying those doctrines *with reference to the alleged aiders' and abettors' own status and actions*. In neither case did the court indicate in any way that, had the aiding and abetting claims been meritorious, they would have been timely because a tolling doctrine applied to save the associated claim against the principal actor. In fact, in *Ingham ex rel. Cobalt Asset Management, L.P.*, the claims against the principal actor are not even discussed. In *Monaghan* v. *Ford Motor Co.*, supra, 850, the Appellate Division held that: (1) because the plaintiff's claims of aiding and abetting a breach of a fiduciary duty contained essential allegations of fraud, they were governed by a six year statute of limitations, rather than a three year statute of limitations; and (2) those claims were adequately pleaded in the plaintiff's complaint. Again, the court in *Monaghan* did not discuss the claims raised against the principal actor and, moreover, no tolling doctrines are mentioned.

Putting aside the foregoing authority, it is doubtful that tolling a statute of limitations against an alleged aider and abettor on the basis of the principal tortfeasor's conduct alone is consistent with the policies underlying statutes of limitations, namely, to prevent the unexpected enforcement of stale claims and the impairment of proof wrought by lost witnesses and/or evidence. See *Neuhaus* v. *DeCholnoky*, 280 Conn. 190, 206–207, 905 A.2d 1135 (2006). From the perspective of an alleged aider and abettor who has no ongoing relationship with a plaintiff, and engages in no further misconduct toward that plaintiff, these concerns clearly are implicated.

[24] We reject the plaintiff's contention that it was the defendant's burden, as the party moving for summary judgment, to negate the plaintiff's allegations regarding the applicability of the continuing course of conduct doctrine. The case on which the plaintiff relies, *Allstate Ins. Co.* v. *Barron*, 269 Conn. 394, 848 A.2d 1165 (2004), did not involve an equitable tolling doctrine and, therefore, is inapposite.

[25] Rule 1.7 of the Rules of Professional Conduct provides: "(a) Except as provided in subsection (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

"(1) the representation of one client will be directly adverse to another client; or

"(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another

client, a former client or a third person or by a personal interest of the lawyer.

"(b) Notwithstanding the existence of a concurrent conflict of interest under subsection (a), a lawyer may represent a client if:

"(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

"(2) the representation is not prohibited by law;

"(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or the same proceeding before any tribunal; and

"(4) each affected client gives informed consent, confirmed in writing."

[26] Unlike MacGrady's conduct in 1999, it is unclear that the 2002 referral was tainted by a conflict of interest and, therefore, constituted an additional breach of a fiduciary duty.

[27] In support of his claim that MacGrady's duty to disclose his prior conflict of interest continued indefinitely, until it was disclosed, the plaintiff cites deposition testimony of the managing partner of Pepe & Hazard agreeing with the plaintiff's counsel when counsel queried the partner on this point. The managing partner's legal opinion, however, is not binding on this court.

The dissent inaccurately characterizes the partner's deposition testimony as expert testimony, accepts that testimony unquestioningly as an accurate statement of the law, and contends, on the basis of the testimony, that it is "undisputed" that MacGrady's fiduciary duty survived the termination of the attorney-client relationship with the plaintiff. We disagree with each of these points. The partner testified as a fact witness, his answer regarding the indefinite duty to disclose is not supported by our research, as we discuss herein, and the defendant in the present matter clearly contests whether that answer is correct.

[28] The duties owed to a former client by his attorney "are significantly lessened as compared to the corresponding duties owed to clients before the client-lawyer relationship has terminated." 1 G. Hazard & W. Hodes, The Law of Lawyering (3d Ed. Supp. 2005) § 13.3, p. 13–7. Generally speaking, an attorney must refrain from representing an adverse party in the same matter in which he previously has represented the former client, or in a substantially related matter, without the former client's written consent, and further, the attorney must not use or disclose confidential information learned about the former client during the representation. See id., § 13.2, p. 13–6; see also Rules of Professional Conduct 1.9. Additionally, an attorney should return property and/or documents belonging to a former client, take reasonable steps to convey to the client material communications received that relate to the concluded representation and refrain from further representation absent new authorization from the client. See 1 Restatement (Third), The Law Governing Lawyers § 33 (2000).

The dissent, quoting without context from *Mergler* v. *Crystal Properties Associates, Ltd.*, 179 App. Div. 2d 177, 182, 583 N.Y.S.2d 229 (1992), observes that " 'attorneys have a continuing confidential relationship of trust and fair dealing [that] survives the termination of the attorney-client relationship . . . .' " See footnote 9 of the dissenting opinion. In *Mergler*, however, the court upheld the viability of a general release executed by a law firm and its former client after the attorney-client relationship had been terminated. *Mergler* v. *Crystal Properties Associates, Ltd.*, supra, 183–84. The court reasoned, in part, that the law firm was not required to establish that execution of the release was free from fraud because, at the time of execution, there no longer was a fiduciary relationship between the parties. Id., 181. Similarly, in the present case, after the completion of the lottery transaction, there no longer was a fiduciary relationship between the plaintiff and MacGrady.

The dissent contends additionally that MacGrady "extended" his 1999 breach of a fiduciary duty by assuring the plaintiff, at the time of the lottery sale, that he would be available to represent him again in the future were he to have trouble with the IRS, and that that assurance "cultivated [MacGrady's] fiduciary relationship with the plaintiff . . . ." The dissent, however, provides no support for the proposition that a fiduciary duty extends beyond the termination of an attorney-client relationship because the attorney offers to represent the client again in the future should the need happen to arise, and we are not aware of any such authority.

[29] In contrast, the doctrine has been found applicable in the case of an ongoing, intra-family attorney-client relationship. See *Giulietti* v. *Giulietti*, 65 Conn. App. 813, 835–36, 784 A.2d 905 (defendant attorney, who provided regular legal services to his elderly father over period of years, had continuing duty to effectuate father's directives regarding transfers of his property to

plaintiff and his siblings), cert. denied, 258 Conn. 946, 947, 788 A.2d 95, 96, 97 (2001).

[30] In the medical malpractice context, we have held that a physician's duty to warn a patient of a known dangerous medical condition or risk may extend beyond the close of treatment, even when there no longer is a physician-patient relationship, and that the physician may breach that duty by his or her continual failure to warn, thereby triggering the continuing course of conduct doctrine. See, e.g., *Witt* v. *St. Vincent's Medical Center*, supra, 252 Conn. 371–72 (pathologist had continuing duty to warn plaintiff of his admitted concern that plaintiff may have been developing lymphoma, which pathologist had failed to communicate at time he evaluated biopsy); *Sherwood* v. *Danbury Hospital*, 252 Conn. 193, 207–208, 746 A.2d 730 (2000) (hospital had continuing duty to inform patient of risk of HIV infection from transfusion of untested blood). Public policy supports the imposition of a continuing duty in this context because, even posttreatment, there is an ongoing threat to the patient's physical health that might be lessened or alleviated by the receipt of a warning, even if it is belatedly delivered. In other words, in such cases, a warning would not be a futility. See also *Handler* v. *Remington Arms Co.*, supra, 144 Conn. 321 (tolling statute of limitation in negligence action for defendant manufacturer's continuing failure to warn of danger from ammunition known to be defective).

[31] The plaintiff directs us to allegations or evidence showing that Mac-Grady, by commission of his original wrong, committed fraud and, contemporaneously with that wrong, promised to do something additional in the future, namely, to represent the plaintiff in related subsequent dealings with the IRS. The plaintiff then contends that the statutes of limitations were tolled under the continuing course of conduct doctrine on the basis of these circumstances. In support of that argument, the plaintiff quotes language from the Appellate Court's opinion in *Rosenfield* v. *Rogin, Nassau, Caplan, Lassman & Hirtle, LLC*, 69 Conn. App. 151, 161–62, 795 A.2d 572 (2002), indicating that a defendant's "affirmative conduct *after the initial wrong*" that could result in tolling includes "making promises after the initial wrong or promises to do anything in the future," or "commit[ing] fraud." (Emphasis added.) See also *Sanborn* v. *Greenwald*, supra, 39 Conn. App. 296–97 (stating similarly). By its terms, this statement of law does not apply to the evidence cited by the plaintiff because that evidence relates to MacGrady's *initial* misconduct, at the time of the lottery transaction, and not to any subsequently occurring misconduct.

The plaintiff also observes, repeatedly, that MacGrady and Pepe & Hazard did not pursue, in their summary judgment motion, statutes of limitations defenses on the malpractice and breach of a fiduciary duty claims that he alleged against them, and contends that this, necessarily, is because those defenses were not viable due to the availability of tolling. This argument ignores the reality that, for various reasons, parties often choose to settle, rather than litigate, claims for which there are potentially meritorious defenses.

[32] The dissent relies on the Appellate Court's decision in *Haas* v. *Haas*, 137 Conn. App. 424, 48 A.3d 713 (2012), as support for the notion that MacGrady's ongoing failure to disclose his earlier breach of a fiduciary duty constituted a continuing course of wrongful conduct. That case is readily distinguishable from the present matter, however, in that it involved a defendant accountant's repeated, active and deliberate concealment of documents and information that would have illuminated his earlier wrongdoing. See id., 434–35. Specifically, the defendant, both prior to and during litigation, refused to provide those documents and information in response to numerous requests of the plaintiff, who was the defendant's elderly mother, the plaintiff's attorney, and a court-ordered forensic accountant. See id., 428–30. In contrast, in the present matter, MacGrady's failure to disclose was entirely passive.